# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

**ANITRA T. HOLMES,**       :
                            :
**Plaintiff,**              :
                            :        **CIVIL ACTION FILE NO.**
**v.**                      :        **1:09-CV-01523-AJB**
                            :
**MICHAEL J. ASTRUE,**      :
*Commissioner of Social*    :
*Security Administration,*  :
                            :
**Defendant.**             :

## ORDER AND OPINION[1]

Plaintiff Anitra Holmes ("Plaintiff") brought this action pursuant to sections

205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), to

obtain judicial review of the final decision of the Commissioner of the Social Security

Administration ("the Commissioner") denying her application for Disability Insurance

Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") under the Social

Security Act ("the Act").[2]  For the reasons stated below, the undersigned **REVERSES**

---

[1]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73.  [*See* Dkt. Entry dated 7/8/2009].  Therefore, this Order constitutes a final Order of the Court.

[2]     Title II of the Social Security Act provides for federal disability insurance benefits.  42 U.S.C. § 401 *et seq*.  Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq*., provides for supplemental security income benefits for the

the final decision of the Commissioner **AND REMANDS** the case to the Commissioner for further proceedings consistent with this opinion.

## I.    PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on August 2, 2005, alleging disability commencing on November 1, 2003, which was then amended to January 1, 2006. [Record (hereinafter "R") 15, 17, 66-67, 690]. Plaintiff's applications were denied initially and on reconsideration. [*See* R39-40]. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). [R51]. An evidentiary hearing was held on July 29, 2008. [R686-720]. The ALJ issued a decision on September 3, 2008, denying Plaintiff's application on the ground that she had not been under a "disability" at any time through the date of the decision. [R12-23]. Plaintiff sought review by the

---

disabled. Title XVI claims are not tied to the attainment of a particular period of insurance disability. *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982). The relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI. *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)). Under 42 U.S.C. § 1383(c)(3), the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI. In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI. However, different statutes and regulations apply to each type of claim. Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims.

2

Appeals Council, and the Appeals Council denied Plaintiff's request for review on March 26, 2009, making the ALJ's decision the final decision of the Commissioner. [R5-7].

Plaintiff then filed an action in this Court on May 29, 2009, seeking review of the Commissioner's decision. *Anitra Holmes v. Commissioner of Social Security*, Civil Action File No. 1:09-cv-01523. [*See* Doc. 2]. The answer and transcript were filed on September 9, 2009, [*see* Docs. 7-8], and the Court heard oral arguments on December 22, 2009, [*see* Doc. 15]. The matter is now before the Court upon the administrative record, the parties' pleadings, the parties' briefs, and the parties' oral arguments, and is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.     STATEMENT OF FACTS

### A.     *Administrative Records*

Plaintiff's yearly earnings report showed that in the 15 years prior to Plaintiff's amended disability onset date of January 1, 2006, Plaintiff earned: (1) $83.28 in 1991; (2) $1,625.38 in 1992; (3) $328.99 in 1993; (4) $3,872.26 in 1994; (5) $4,333.49 in 1995; (6) $4,867.25 in 1996; (7) $3,366.83 in 1997; (8) $7,357.88 in 1998; (9) $5,015.15 in 1999; (10) $1,288.74 in 2000; (11) $7,159.24 in 2001; (12) $9,990.38 in 2002; (13) $17,890.38 in 2003; (14) $13,465.55 in 2004; and (15) $11,087 in 2005.

3

[R80].  In an undated work history report, Plaintiff indicated that she had engaged in the following work: lunch monitor, daycare worker, factory temp, security guard, and mail room worker.  [R106].  Plaintiff described her factory temp job as involving "packing, sorting, production, assembly line, simple work on conveyors usually packing boxes with varied product."  [R108].  To obtain this previous work, Plaintiff indicated that people would help her fill out applications.  Plaintiff would stop working because the temporary staffing agency got tired of sending her out on jobs after Plaintiff continued to make errors when on assignment.  [R91].

In a series of disability reports, Plaintiff indicated that she could speak English but not read or write it.  [R90, 132].  The highest grade Plaintiff completed was the seventh grade.  [R93].  She believed that her learning disability precluded her from working because she could not read.  [R90-91].  Plaintiff had problems sleeping, she would sit in the dark and think, and she would walk outside if  there were not many people.  [R110].  Plaintiff cared for her tenth grade son and her five month old baby, but her son helped out a lot.  [R111].  Plaintiff's son reminded her to take her medications, did the house work, and cooked meals, but Plaintiff made sandwiches and prepared bottles. [R112, 120].  Plaintiff's son drove her, but Plaintiff would drive when traffic was light.  [R113, 121, 122].  She could grocery shop, pay bills, count change,

4

handle a savings account, and use a checkbook.  [R113, 121].  Plaintiff did not have public interaction with people, but she interacted with her son and friends.  [R114].

Plaintiff stated that her injuries affected her ability to dress, bathe, care for her hair, feed herself, and use the toilet.  [R111].  Plaintiff's impairments affected her memory, concentration, understanding, and ability to complete tasks, to follow instructions, and to get along with others.  Plaintiff was okay with following spoken instructions, but she did not follow written instructions well.  [R115].  Plaintiff would get mad quickly and blow up.  [R116].  Plaintiff had never been able to get along with people.  Plaintiff believed that her impairments affected her ability to lift, squat, bend, stand, walk, climb stairs, remember, understand, follow instructions, and get along with others.  [R123, 130].

The September 2005 Field Office disability report indicated that Plaintiff had difficulty reading, understanding, being coherent, and talking.  The examiner indicated that Plaintiff had some issues understanding questions.  [R97].

## B.    *Medical Records*

During the first week of March 2005, Plaintiff was hospitalized at the Henry Medical Center where she was given a final diagnosis of intrauterine pregnancy at

AO 72A
(Rev.8/8
2)

22 weeks and incompetent cervix.  When she was discharged on March 8, she was placed on bed rest.  [R206].

Plaintiff was again hospitalized between March 29, 2005, and April 16, 2005, during which she had a C-section and serious medical problems following the C-section, [*see* R210-54], including a disseminated intravascular coagulopathy ("DIC") (a severe blood disorder in which the proteins that control blood clotting become abnormally active),[3] [R221, 226].  The course of the hospital stay was as follows: (1) admitted with spontaneous rupture of membranes with a breech presentation; (2) C-section; (3) bleeding from incision site and distended abdomen; (4) blood transfusions; (5) intubation followed by a stay in the ICU; (6) removal of the tube and dialysis during stay; and (7) discharge followed by home health care.  [R210-11].

A post-hospital visit with Dr. M. Hafiz Rahman on April 27, 2005, indicated that Plaintiff was alert and oriented with normal insight and judgment.  Plaintiff's gait was steady.  Dr. Rahman determined that Plaintiff did not need further dialysis and had no dietary limitations except for limiting salt intake because of borderline high blood pressure.  [R552].

---

[3]    Unless otherwise stated, the descriptions and definitions of medications and medical terms are based on information from the Medline Plus website.  *See* Medline Plus, http://medlineplus.gov/.

6

On August 25, 2005, Plaintiff went to the Clayton Center for a diagnostic assessment. She was diagnosed with major depression. [R329]. Her mood was noted as depressed, crying, and anxious. Her Global Assessment of Functioning ("GAF") score was 60.[4] [R330]. A medical note from the assessment is largely illegible, but it indicates that Plaintiff had fair motivation and was prescribed Lexapro (medication to treat depression and generalized anxiety disorder). [R331]. A September 9, 2005, note from the Clayton Center indicated that Plaintiff had major depression and anxiety

_____

[4] The undersigned has previously described the GAF score as "rat[ing] an individual's overall level of psychological, social, and occupational functioning." *Volley v. Astrue*, No. 1:07-cv-138-AJB, 2008 WL 822192 at *2 n.6 (N.D. Ga. Mar. 24, 2008) (citing *Lozado v. Barnhart*, 331 F. Supp. 2d 325, 330 n.2 (E.D. Pa. 2004) (citing Diagnostic and Statistical Manual of Mental Disorders (4th Ed.) ("DSM-IV" at 32)). The GAF ranges

> from 0 to 100 and is divided into 10 ranges of functioning, requiring the examiner to pick a value that best reflects the individual's overall level of functioning using either symptom severity or functioning. . . . Each range can be described as follows: . . .; a GAF score of in the range of 41-50 indicates "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job);" a GAF score in the range of 51-60 indicates "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or coworkers);". . . .

*Id.* (quoting *Lozado*, 331 F. Supp. 2d at 330 n.2 (citing DSM-IV at 32, 34)).

AO 72A
(Rev.8/8
2)

disorders.  Plaintiff was noted as not being able to read, having poor coping skills, and poor financial support.  [R327].  Plaintiff was referred to counseling.  [R328, 367].  Plaintiff was additionally prescribed Vistaril (medication to treat anxiety) on September 27, 2005, and her medication was increased to control anxiety and depression.  [R367, 392].  The doctor continued these medications on December 28, 2005.  [R394].  Plaintiff then was seen for counseling on multiple occasions between September 26, 2005, and February 27, 2006.  [R347-61].

Plaintiff had an appointment with Dr. M. Hafiz Rahman on September 19, 2005, who noted that Plaintiff had no dizziness, leg edema, or nausea.  Plaintiff was taking Lexapro once daily.  She had normal judgment and insight and good memory.  [R545].  Plaintiff's gait was normal, and her renal function had returned to normal.  [R546].

Doug Stone-Miller, Ph.D., performed a consultative psychological exam on September 28, 2005. [R270-73].  Plaintiff reported the following information to Stone-Miller.  She had stopped working as an assembly worker a month prior to the appointment because she had been terminated.  Plaintiff missed a lot of work on the job and felt stressed.  Plaintiff did not do any recreational activities and had trouble concentrating on movies or television.  She needed reminders from her son to do things.  She did not socialize because she was too stressed and she did not like to go outside.

8

She was receiving therapy and taking hydroxyzine and Lexapro for her symptoms without much help.  [R270-71].

Stone-Miller found Plaintiff to be poorly groomed but with good hygiene and posture.  Her behavior was immature, but she had good social skills, clear communication, and was cooperative.  Plaintiff's rate of thought was normal.  Her mood was anxious and dysthymic, and she cried at unusual times.  Plaintiff's long term memory was deficient but consistent with her IQ, which was "in the range of mild mental retardation."   When presented with testing material, Plaintiff became "hysterical," began rocking and crying, indicated she did not want to do school stuff, stated she could not read and became hysterical with the admission.  The testing was discontinued because Plaintiff was not cooperative.  [R272].

Under the heading "Validity Statement," Stone-Miller wrote:

The claimant's motivation throughout the evaluation was poor, as was her task persistence.  Overall, the information obtained in the interview was consistent with her presentation, and these sources were consistent with the paperwork that was received.  However, the background records . . . are quite dated and no recent medical records were received.  There is general consistency across the available sources of information indicating an adequate level of validity for this evaluation.

[R272].

9

Stone-Miller diagnosed Plaintiff with Post Traumatic Stress Disorder ("PTSD"), generalized anxiety disorder, panic disorder with agoraphobia, and major depressive disorder, recurrent, moderate.   [R272].   In the report's summary, Stone-Miller observed:

> . . . . She endorsed essentially every symptom of mental illness that was presented to her.  The claimant was very disjointed in discussing her history and appeared unable to provide even the simplest of information regarding such things as her educational level and past jobs.  She became extremely emotional and refused to complete standardized testing.  These facts, in combination with the lack of recent mental health treatment records and the lack of corroboration by a collateral source, *raise the issue of malingering*. . . .

[R273 (emphasis added)].  He found, however, that Plaintiff had or may have had the following limitations: (1) difficulty understanding and remembering simple instructions; (2) possible difficulty understanding, remembering and carrying out simple instructions; (3) possible difficulty sustaining concentration in daily life; (4) possible difficulty relating to others in daily life; (5) possible difficulty adhering to a typical workday or week; and (6) difficulty maintaining a minimally acceptable pace at work.  [R273].  Finally, Stone-Miller determined that Plaintiff could not manage her disability funds "due to the nature and severity of her overall clinical condition." [R273].

10

On October 21, 2005, Michael Carter, Ph.D., completed a Psychiatric Review Technique form in which he determined that there was insufficient evidence to make a medical determination.  [R274-86].

Plaintiff had a follow up visit stemming from her April 2005 hospital visit in October 2005.  Her status was determined to be stable, and she did not report having ongoing problems at the time.  She reported taking Lexapro.  [R291].

Plaintiff complained of low bilateral leg pain on November 7, 2005, but she showed no gait disturbance and reported no numbness.  [R289].  Plaintiff was diagnosed with leg pain, etiology unclear, and she was told to use over-the-counter pain medication.  [R29].

Plaintiff was seen by Dr. M. Jones on November 16, 2005, for a consult because of leg pain.  Plaintiff complained of left side weakness.  She was assessed with: (1) CVA (cerebrovascular accident, *i.e.*, a stroke); (2) left leg weakness; (3) anxiety; (4) history of disseminated intravascular coagulopathy; and (5) history of acute renal failure.  Plaintiff was to continue with physical therapy.  [R296].

In a January 9, 2006, follow up visit, Dr. Jones examined Plaintiff who complained of leg swelling, knee pain, and dizzy spells.  Plaintiff reported taking Lexapro.  Plaintiff was assessed with: right knee pain, lower back pain, dizziness;

11

"pedaledima"; right lower quadrant pain; and history of a learning disability. [R297].

A January 17, 2006, note by Dr. Jones determined that Plaintiff suffered from: a stroke;

left side hemiparesis (muscular weakness or partial paralysis); and learning disability.

[R295].

Plaintiff had a physical therapy evaluation on January 12, 2006. [R318].

Plaintiff reported pain of 7 on a 10-point scale. She had full range of motion, and her

left leg strength was 3+/5 while her right was 4+/5. [R318]. The goals of the therapy

were to improve left leg strength, improve balance, and improve endurance from fair

to good. [R319]. Plaintiff then had physical therapy appointments on January 12, 16,

and 20, 2006, and February 1, 2006. [R313, 317].

A January 25, 2006, psychiatric review technique by Celine Payne-Gair, Ph.D.,

found that Plaintiff had a personality disorder that was not severe in which she

exaggerated and had poor cooperation. [R298, 305]. Payne-Gair found that Plaintiff

had no limitations in daily living activities, maintaining social functioning, and

maintaining concentration. [R308].

A discharge summary from Clayton Center Services on February 27, 2006, by

a social worker indicated that Plaintiff had made some improvement, but that she was

discharged because she needed "CSI" services and lived in a different county. Her

GAF score was 60 at discharge.  The note indicated that Plaintiff had an appointment with the McIntosh Trail Community Service Board in Henry County.  [R325].  The social worker's diagnosis indicated that Plaintiff had: (1) major depressive disorder and anxiety on Axis I; (2) mild mental retardation by history on Axis II; (3) DIC, stroke, and left side weakness by history on Axis III; (4) financial, social, and educational stress/barriers on Axis IV; and (5) a GAF score of 55 on Axis V.  Plaintiff's prognosis was, however, "Good."  [R405].[5]  The social worker determined that Plaintiff had mild limitations in her ability to: remember locations and work procedures; to understand, remember, and carry out one and two-step instructions; ask simple questions; accept instructions and respond appropriately to criticism; maintain socially appropriate behavior; and maintain standards of cleanliness.  [R408-09].  The social worker also found that Plaintiff was moderately limited in her ability to: understand, remember, and carry out detailed instructions; sustain an ordinary routine without supervision; work in coordination with or proximity to others without being distracted; make simple

---

[5]     The Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") provides a five-axis evaluation system to "facilitate[] comprehensive and systematic evaluation with attention to the various mental disorders and general medical conditions, psycho social and environmental problems, and level of functioning that might be overlooked if the focus were on assessing a single presenting problem." *Volley*, 2008 WL 822192 at *2 n.5 (quoting DSM-IV (4th ed. 2000) at 27).

13

work-related decisions; interact appropriately with the public; get along with co-workers or peers without distracting them; respond appropriately to changes in the work setting; be aware of normal hazards; and travel to unfamiliar places or use public transit. [R408-10]. The social worker finally determined that Plaintiff was markedly limited in her ability to: maintain concentration for extended periods; perform activities within a schedule; complete a normal workweek without psychologically based interruptions; and set realistic goals. [R408-10]. The social worker determined that Plaintiff was capable of tolerating low work stress. [R411]. Finally, the social worker indicated that Plaintiff would be absent more than three times per month because of her impairments. [R412].

A March 24, 2006, letter from Shobha Rao, M.D., stated that Plaintiff had not been able to work for the past 12 months because she had a high-risk pregnancy beginning in November 2004, an emergency C-section in April 2005, and an abdominal hemorrhage, which resulted in acute respiratory and renal failure. The note concluded that Plaintiff was still engaging in physical therapy. [R369].

Plaintiff had an EEG on March 24, 2006, because of a "recent" stroke and persistent episodic neurologic symptoms. The EEG was normal. [R419].

14

On March 28, 2006, Plaintiff had brain and lumbar spine MRIs, which were "unremarkable."  [R371-72].

A Georgia Neurology and Sleep Medicine Associates medical note from April 12, 2006, indicated that Plaintiff complained of continual numbness on her left side, vertigo, generalized weakness of the lower extremities, and left ankle pain. Plaintiff's upper and lower extremity strength was grossly intact.  Her toe to heel gait was unstable.  The doctor's impression was status post CVA, dizziness, head ache, and left leg pain.  The plan for Plaintiff was strength training and physical therapy.  [R418]. Plaintiff had a follow up on May 25, 2006, and the doctor indicated that Plaintiff: (1) had status post CVA and DIC; (2) experienced dizziness and headache; (3) had a history of learning disabilities; and (4) had sickle cell anemia.  [R414].  Subsequent medical notes from October and December 2006 and January and March 2007 indicate that Plaintiff continued to suffer from dizziness, head aches, and leg pain and that she also suffered from depression and anxiety that was being treated by another doctor. [R590-93].

Plaintiff had an MR angiography ("MRA") of her head because of dizziness on June 12, 2007.  The MRA revealed that Plaintiff had areas of vascular narrowing, but that there was no other significant vascular abnormality.  [R587].  A medical note from

15

Georgia Neurology and Sleep Medicine Associates from June 28, 2007, indicated that Plaintiff continued to have dizziness, head aches, leg pain, low back pain, and depression/anxiety.  [R594].

An August 1, 2007, letter from a registered nurse at the McIntosh Trail Community Service Board reported that Plaintiff had been treated at the center since March 16, 2006,[6] where she was diagnosed with major depressive disorder with psychotic features and generalized anxiety disorder.  Plaintiff was taking Lexapro and Vistaril.  Plaintiff had not had paranoia or psychosis symptoms since February 2007, but was complaining of depression.  The nurse believed that employment would exacerbate Plaintiff's symptoms of depression, anxiety, and psychosis.  [R421].

On August 16, 2007, Dr. Marilavinia Jones recommended that Plaintiff be evaluated for bariatric surgery because Plaintiff was overweight with a BMI of 39,[7] had hypertension, and was at risk of type 2 diabetes and a recurring CVA.  [R450].

---

[6]     The record contains counseling notations and evaluations from the McIntosh Trail Community Service Board between March 2006 and May 2006. [R425-447].

[7]     A BMI between 30.0 and 39.9 is considered obese while a BMI over 40 is deemed morbidly obese.

16

On October 10, 2007, Dr. Smith and Anne Evans completed a psychiatric/psychological impairment questionnaire, which noted that Plaintiff had been seen once every one to two months between March 2006 and October 2007.[8]  Plaintiff was diagnosed with major depressive disorder with psychotic features.  Her GAF score was 45 and the highest score from the past year was 45.  Plaintiff's prognosis was "Fair - Good."  [R598].  Plaintiff exhibited the following characteristics: poor memory; delusions; anhedonia; paranoia; difficulty concentrating; suicidal ideation; oddities of thought; social withdrawal; obsessions or compulsions; intrusive recollections of traumatic experiences; and generalized, persistent anxiety.  [R599].

Dr. Smith determined that Plaintiff was mildly limited in her ability to: ask simple questions or request assistance; and be aware of hazards and take precautions. [R602-03].  Plaintiff was moderately limited in her ability to: remember locations and procedures; understand, remember, and carry out one or two step instructions; work in combination with or proximity to others; make simple work-related decisions; interact appropriately with the general public; maintain socially appropriate behavior; respond appropriately to changes in work setting; and use public transportation.  [R601-03].

---

[8]      The notes from Anne Evans for this period of time are in the record at pages 623-639.  Also, social worker notes from the McIntosh Trail Community Service Board are at pages 640-668 of the record.

17

Plaintiff was markedly limited in her ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine without supervision; complete a normal workweek without interruptions from psychological symptoms; accept instruction and respond appropriately to criticism; get along with coworkers or peers without distracting them; and set realistic goals and make plans independently.  [R601-03].

At the time Dr. Smith completed the evaluation form, Plaintiff was taking Lexapro and Nistaril.  [R603].  Dr. Smith found that Plaintiff was incapable of tolerating low stress because her depression was easily exacerbated by change in routine and her medical condition impacted her depression.  [R604].  Dr. Smith believed that Plaintiff would be absent from work more than three times per month and that the limitations had applied since 1995.  [R605].

Dr. Stone-Miller performed another psychological evaluation of Plaintiff on April 23, 2008.  Plaintiff reported that she had conflicts with others over everything when she worked.  Her son helped out a lot.  Her sleep was disturbed, and she did not do anything for recreation.  [R607].  She could not concentrate on television or movies. Plaintiff did not have a valid driver's license.  Plaintiff did not do chores because of

18

stress.  Plaintiff did not socialize with others and did not tolerate other people well. [R608].

Stone-Miller observed that Plaintiff's behavior was immature and she spoke in a childish voice.  Plaintiff had marginal social skills, but she communicated clearly, was cooperative, and established a good rapport.  Plaintiff's speech was simple, but was a normal rate and quantity.  Plaintiff's mood was dysthymic and she sobbed through much of the interview.  Plaintiff had vegetative symptoms.  Plaintiff could not recall four words after three minutes, and her long term memory was deficient.  [R609].

Plaintiff's intelligence scores were as follows: verbal IQ of 59; full scale IQ of 56; and performance IQ of 60.  Stone-Miller deemed Plaintiff's test results to be an accurate representation of her abilities.  He found her motivation to be adequate.  He did not believe that Plaintiff could manage her bills independently due to her low test scores.  [R610].

Dr. Stone Miller diagnosed Plaintiff with: (1) PTSD, panic disorder with agoraphobia, and major depressive disorder, recurrent, moderate, in partial remission on Axis I; (2) mild mental retardation on Axis II; and (3) stroke and DIC on Axis III. He added that Plaintiff's mood disorders and intellectual and adaptive limitations were chronic  [R611].  He noted that Plaintiff would: have difficulty understanding and

19

remembering simple instructions as evidenced by her testing; not be able to consistently carry out simple instructions; not consistently be able to maintain concentration due to frequent preoccupations; not be able to relate appropriately to others due to paranoia; not be able to adhere to a typical workday or week due to an inability to self-structure and execute a daily routine; and have problems maintaining an acceptable pace in a work setting because of her episodic panic.  [*Id.*].

Dr. Stone Miller completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) form and found that Plaintiff's impairments would markedly restrict Plaintiff's ability to: understand, remember, and carry out simple instructions; make judgments on simple, work-related decisions; and interact with the public.  [R613-14].  Stone-Miller determined that Plaintiff's impairments would extremely restrict her ability to: understand, remember, and carry out complex instructions; and make judgments on complex, work-related decisions.  [R613].  Additionally, Dr. Stone-Miller found that Plaintiff was moderately limited in her ability to: interact appropriately with supervisors and co-workers; and respond appropriately to work situations and changes in the work setting.  [R614].

On February 8, 2008, Dr. Neil Berry saw Plaintiff because of swelling, popping, catching, and instability symptoms in her right knee, which had been ongoing for

20

several months.  [R619].  X-rays of the right knee were normal, but Dr. Berry believed that Plaintiff had a probable meniscal tear.  [R620].  Following an MRI, Dr. Berry determined on March 8, 2008, that Plaintiff had a chronic tear of the anterior cruciate ligament.  He did not recommend surgery because of Plaintiff's previous stroke and very sedentary lifestyle, but he instructed Plaintiff to lose weight and exercise.  Plaintiff was not referred to physical therapy, but she was given Darvocet (pain reliever).  [*Id.*].

C.    *Evidentiary Hearing Testimony*

At the July 29, 2008, ALJ hearing, Plaintiff testified that she was 35 years old. [R694].  Plaintiff had last worked in 2005, but she had to leave the job because of problems with her pregnancy.  [R695].  Plaintiff completed special education classes through the seventh grade, but she left school to have her first child.  [R695-96].

Plaintiff did not leave her home too much, and when she left the house, she usually went to Wal-Mart at 2:00 or 3:00 a.m. to avoid people.  [R700].  Plaintiff did not like the clutter, and she would leave the store if there were too many people. [R709-10].

Plaintiff's oldest son was about to enter college, and her three year old daughter was in preschool.  [R701].  Plaintiff prepared breakfast for her daughter, dressed her, and put her on the school bus.  When Plaintiff's daughter left for half the day, Plaintiff

21

would sit around the house and think.  [R701].  Plaintiff or her son would prepare her daughter's lunch.  Plaintiff cleaned the house, washed clothes, and washed dishes, but she also would instruct her son to do these chores if she did not feel like it.  Plaintiff had a driver's license, but she did not like to drive in traffic.  [R702].

Plaintiff reported taking medication for leg swelling, high blood pressure, asthma, depression, and sleep apnea.  [R704-06].  Plaintiff would have difficulty sleeping if she did not take her medication because she would think about her life. [R707].  Plaintiff would not concentrate on things in which she was not interested.  She did not have any hobbies because of stress.  Plaintiff could comprehend reading something if she re-read the document.  [R708].  Plaintiff would have crying spells. She reported being hard on her son, so that he would stay focused and do the right thing.  Plaintiff reported that she did not have friends.  [R709].

Plaintiff preferred to work by herself, and she would remain quiet and keep to herself if she worked in a group of people.  [R710].  At her most recent job, she had worked in a warehouse and placed uniforms in a box.  Plaintiff did not have problems performing the job.  Plaintiff could no longer do the job because of the lifting.  She reported that she could only lift 10 pounds and could walk no more than an hour

AO 72A
(Rev.8/8
2)

because her legs bothered her.  [R711].  Plaintiff could not sit longer than 30 minutes because she had to keep her legs moving or elevated.  [R712].

The vocational expert ("VE") testified that Plaintiff's past work was as follows: (1) a warehouse worker, which is medium and unskilled work; (2) dining room attendant, which is medium and unskilled work; (3) daycare attendant, which is light and semi-skilled work; and (4) small products assembler, which is light and unskilled work.  [R713].  The VE testified that a hypothetical person with the following characteristics could perform Plaintiff's past work as a parts assembler: Plaintiff's age, education, and work profile; capable of a full range of one and two step light work; requirement of minimal contact with the public; and a need for a low stress environment.  [R713-14].  The VE also testified that such a person could perform other light, unskilled work, including house cleaner, garment bagger, and bobbin sorter.  [R714].  The VE next testified that these jobs could be performed by an individual with the same profile as above along with the additional limitation of being able to interact with coworkers only occasionally.  [R714].  The VE determined that an individual who also had to miss 4 days per month for medical appointments could not perform these jobs.  [R714-15].

23

The VE testified that an individual who needed close supervision could not perform one and two step jobs.  The VE finally determined that an individual with a "marked" inability to perform simple, one or two step activities could not sustain employment.  An individual with a "marked" inability to follow simple instructions and make simple decision also could not sustain employment.  [R716].

## III.   ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.   The claimant has not engaged in substantial gainful activity since January 1, 2006, the amended alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: slipped disc by history, postoperative complications from childbirth, depression, and learning disorder (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

. . .

24

AO 72A
(Rev.8/8
2)

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(c) except that she is limited to 1-2 step tasks in a low stress environment with minimal contact with the general public.

. . .

6.      The claimant is able to perform her past relevant work as a small products assembler.  (20 CFR 404.1565 and 416.965).

. . .

7.      The claimant was born on February 23, 1973 and was 30 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has a marginal education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.     Even if the claimant were unable to perform her past relevant work, there are jobs that exist in significant numbers in the national economy that the claimant can perform considering her age, education, work experience, and residual functional capacity (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

AO 72A
(Rev.8/8
2)

. . .

> 11. The claimant has not been under a disability as defined in the Social Security Act from November 1, 2003 through the date of the decision (20 CFR 404.1520(g) and 416.920(g)).

[R15-23].

The ALJ explained that Plaintiff's mental impairment did not meet or equal a listing at Step Three because although Plaintiff had marked difficulties in social functioning, she only had mild restrictions with daily living and concentration, persistence or pace.  [R17-18].

In making the RFC determination of light, simple work in a low stress environment, the ALJ engaged in the following analysis.  He first noted Plaintiff's history of musculoskeletal, psychological, and pregnancy related impairments and summarized the evidence from Dr. Stone-Miller, Dr. Shobha Rao, Lisa Saidi, treatment notes from the McIntosh Trail Community Service Board, and the ALJ's observations of Plaintiff during the hearing.  [R19-20].  The ALJ then found that although Plaintiff's impairments could produce her alleged symptoms, Plaintiff was not credible given her appearance and statements at the hearing.  [R20].  The ALJ then determined that certain evidence suggesting a restrictive RFC were not "fully credible" because of Plaintiff's

AO 72A
(Rev.8/8
2)

appearance and testimony during the hearing. [R21]. Relying on Plaintiff's ability to care for an infant and delegate tasks to her son, the ALJ also found that Dr. Stone-Miller's opinion that Plaintiff could not perform unskilled work was wrong given that "childcare is oftentimes both physically and emotionally demanding." [*Id.*]. The ALJ finally articulated how he was weighing various pieces of evidence, finding specifically that: (1) Dr. Stone-Miller's 2008 assessment was given "less weight than his [2005] assessment"; (2) the opinions of Saidi, Anne Evans, and Dr. Smith were inconsistent and hyperbolized Plaintiff's symptoms given the evidentiary record, Plaintiff's appearance, and the evidence of Plaintiff's competence in maintaining a home, a toddler, and sending her son to college; and (3) the opinion of Dr. Rao was given "substantial weight." [*Id.*].

The ALJ then determined at Step four that Plaintiff could perform her past relevant work of a small products assembler based on the VE's testimony. [R21]. Finally, the ALJ alternatively found at Step five that Plaintiff could perform other work based on the VE's testimony that other jobs were available for someone with Plaintiff's RFC, age, and educational background. The ALJ rejected the hypothetical that Plaintiff posed to the VE because the limitations were inconsistent with Plaintiff's prior work history and were based on limitations from discredited evidence. [R22].

AO 72A
(Rev.8/8
2)

## IV.   STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274,

1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments, which significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that the impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. To be considered disabled, the claimant must

29

AO 72A
(Rev.8/8
2)

prove an inability to perform the jobs that the Commissioner lists. *Doughty*, 245 F.3d at 1278 n.2.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).

## V.    SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner. Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive. *Lewis v. Callahan*, 125 F.3d

30

1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means more than a scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury.  *Richardson v. Perales*, 402 U.S. 389 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision.  *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991).  In contrast, review of the ALJ's application of legal principles is plenary.  *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

31

## VI.   CLAIMS OF ERROR

Plaintiff argues that the ALJ committed the following three errors: (1) the ALJ failed to weigh or properly evaluate the opinions of the examining and treating experts; (2) the ALJ failed to comply with Social Security Ruling ("SSR")[9] 82-62 in determining whether Plaintiff could perform her past relevant work; and (3) the ALJ failed to provide a complete residual functional capacity ("RFC") determination. [*See* Doc. 11 at 1].  The Court discusses these claimed errors below.

### A.   *Medical Opinions*

Plaintiff argues that the ALJ erred in describing the weight he gave to the 2005 assessment by Dr. Stone-Miller. [Doc. 11 at 13-14].  He also contends that the ALJ erred in giving more weight to Dr. Stone Miller's 2005 assessment over the 2008 assessment because: (1) the two were not significantly different; and (2) the malingering issue from 2005 was resolved by 2008 with Plaintiff's record of mental

---

[9]      "Social Security Rulings are agency rulings published under the authority of the Commissioner of Social Security and are binding on all components of the Administration."  *Miller v. Comm'r of Soc. Sec.*, 246 Fed. Appx. 660, 662 (11th Cir. 2007) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990)); *see also* 20 C.F.R. § 402.35(b)(1) (noting that Social Security Rulings "are binding on all components of the Social Security Administration").  These rulings are not binding, however, on the federal courts, *id.*, but they are entitled to deference, *see Fair v. Shalala*, 37 F.3d 1466, 1469 (11th Cir. 1994).

health treatment.  [*Id.* at 14-15].  Plaintiff also argues that the ALJ improperly rejected the opinions of the other treating mental health professionals, which were consistent with the mental health records and Dr. Stone-Miller's assessments, because: (1) Plaintiff's credibility is not a valid reason for discounting medical opinions; (2) Plaintiff's weight loss does not explain how the expert opinions were flawed; (3) the ALJ's speculation based on Plaintiff's appearance at the hearing is an improper basis to reject an opinion; (4) the ALJ misreported Plaintiff's hearing testimony; and (5) the ALJ could not rely on Plaintiff's delegation of responsibility, Plaintiff's son's plans to go to college or Plaintiff's ability to care for a child as bases for finding Plaintiff not disabled.  [*Id.* at 15-17].

The Commissioner responds that the ALJ properly rejected medical opinions. [Doc. 13 at 4-12].  First, the Commissioner contends that the ALJ properly gave Dr. Stone-Miller's 2005 report more weight than the 2008 report because: (1) both opinions were not due deference given that they came from a consulting doctor; and (2) the 2005 report documented evidence of possible malingering.  [*Id.* at 4-5].  Second, the Commissioner contends that the ALJ properly rejected Dr. Stone-Miller's 2008 opinion because: (1) the 2008 report was inconsistent with the 2005 report regarding the malingering issue; (2) Plaintiff's hearing testimony contradicted

33

statements made to Dr. Stone-Miller in 2008, thereby allowing the ALJ to find that Plaintiff's presentation to Dr. Stone-Miller was not credible; and (3) Plaintiff's life skills of preparing bottles, sending a son to college, and delegating tasks to her son contradicted Dr. Stone-Miller's finding that Plaintiff could not perform unskilled work. [*Id.* at 6-9]. Third, the Commissioner argues that the ALJ was not required to give any weight to the opinions of nurses and social workers at the Clayton and Henry County community health centers, especially given the ALJ's finding that they were inconsistent, hyperbolized, and contradicted by other record evidence. [*Id.* at 10-11]. The Commissioner also argues that these opinions were inconsistent with other record evidence as follows: (1) the evidence demonstrated that Plaintiff's highest GAF score for 2005 was 70, not 55, as Saidi reported; (2) state agency psychologist Michael Carter found insufficient evidence of an impairment in October 2005; (3) state agency psychologist Celine Payne-Gair found insufficient evidence of an impairment in January 2006; (4) the marked limitations of Evans and Dr. Smith that supposedly existed since 1995 was contradicted by Plaintiff's ability to work after 1995; and (5) Plaintiff's appearance at the hearing contradicted the mental health opinions. [*Id.* at 11-12].

34

Plaintiff replies by first noting that Dr. Stone-Miller's reference to malingering was not supported by the 2005 report because Stone-Miller determined that his evaluation had an adequate level of validity. [Doc. 14 at 1-2]. She next contends that there was no inconsistency between the 2005 and 2008 reports (besides the malingering comment) and that the longitudinal history documented Plaintiff's mental health status and removed malingering concerns. [*Id.* at 2]. Plaintiff asserts that the Court cannot evaluate how the ALJ complied with the statutory and regulatory requirements in choosing the 2005 opinion over the 2008 opinion. [*Id.* at 2-3]. Plaintiff further argues that the ALJ should have observed that the opinions by the nurses and social workers were consistent with Dr. Stone Miller's 2008 opinion. [*Id.* at 3]. Plaintiff contends that the Commissioner's reliance on consultative opinions constitute impermissible *post hoc* rationalizations because the ALJ did not rely on these opinions. [*Id.* at 4]. Finally, Plaintiff reiterates that the ALJ's conclusions stemming from Plaintiff's hearing testimony is mere speculation upon which the ALJ cannot rely in making a disability determination. [*Id.* at 4-5].

The ALJ must consider all medical opinions in the case record. 20 C.F.R. §§ 404.1527(b), 416.927(b), (d). Medical opinions are statements "that reflect judgments about the nature and severity of [the claimant's] impairment(s), including

35

[the claimant's] symptoms, diagnosis, and prognosis, what [the claimant] can still do despite impairments, and [the claimant's] physical and mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2).  The ALJ considers the following factors in weighing medical opinions: (1) the examining relationship; (2) the treatment relationship; (3) the supportability of the opinion; (4) the consistency of the opinion with the record; (5) the specialization of the source; and (6) other factors. *Id.* §§ 404.1527(d)(1)-(6), 416.927(1)-(6).[10]  "The [ALJ] may reject any medical opinion if the evidence supports a contrary finding." *Kemp v. Astrue*, 308 Fed. Appx. 423, 427-28 (11th Cir. 2009) (citing *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985)).  In rejecting a medical opinion, the ALJ may consider "the claimant's appearance and demeanor during the hearing," but the "ALJ must not impose his observations in lieu of a consideration of the medical evidence presented." *Norris v. Heckler*, 760 F.2d 1154, 1158 (11th Cir. 1985).  Thus, an ALJ may not substitute his own medical opinion for those of the medical experts.  *Davis v. Barnhart*,

---

[10]    These same factors are also used in evaluating opinions by sources who are not acceptable medical sources such as nurse practitioners and licensed clinical social workers. *See* SSR 06-03p. The Commissioner has concluded that "[o]pinions from [nurse practitioners, physician assistants, and licensed clinical social workers], who are not technically deemed 'acceptable medical sources' . . . are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.*

36

377 F. Supp. 2d 1160, 1164 (N.D. Ala. 2005) (citing *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir.1992) (Johnson, J. concurring)).[11]

The Court concludes that the ALJ improperly weighed the medical opinion evidence because he substituted his own opinion for those of the medical experts. The explicit example of this substitution in the ALJ decision is found by the following statement:

> It appears that [Plaintiff's] weight loss may have ameliorated her depression, as she demonstrated no signs of depression, closely followed the proceedings with clear understanding, and appeared quite capable of dealing with her affairs.

[R20]. This statement reflects the ALJ's attempt at "diagnosing" Plaintiff's mental health. As far as the Court is aware, the ALJ is not trained in diagnosing depression, evaluating the severity of depression, or identifying the warning signs for depression, so it is unclear how the ALJ can assert that weight loss and Plaintiff's demeanor at an hour long hearing are indicative of whether her depression had ameliorated. The Court is unaware of any medical evidence in the record that supports this finding. As a result, the ALJ's "diagnosis" reflects the use of " 'sit and squirm' jurisprudence" that is

---

[11]   For opinions on issues reserved for the Commissioner, the ALJ considers these opinions, but they are not given any special deference. 20 C.F.R. §§ 404.1527(e)(2)-(3), 416.927(e)(2)-(3).

37

prohibited by the Eleventh Circuit.[12]  Under this sit and squirm analysis, "an ALJ *who is not a medical expert* will subjectively arrive at an index of traits which he expects the claimant to manifest at the hearing.  If the claimant falls short of the index, the claim is denied."  *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982) (emphasis added).[13]

Here, the ALJ clearly developed an index of criteria for depression (including weight loss/gain, comprehension, and ability to deal with affairs) and found that Plaintiff did not meet the criteria on this list.  This is a classic example of sit and squirm

_____

[12]    Although the sit and squirm analysis was developed in relation to determining whether Plaintiff was suffering from pain, courts have applied the analysis to mental impairments.  *See Hobbs v. Astrue*, No. 1:07-cv-1099, 2008 WL 2874374, *5 n.7 (M.D. Ala. July 24, 2008); *McPhadden v. Astrue*, No. 1:07-cv-15, 2007 WL 4403210, *12 (N.D. Fla. Dec. 12, 2007); *Watts v. Heckler*, No. 1:83-cv-445, 1984 WL 62853, *2 (N.D. Ga. Mar. 6, 1984) (O'Kelley, J.).

[13]    The ALJ's use of such decisionmaking methodology is improper because it

> will not only result in unreliable conclusions when observing claimants with honest intentions, but may encourage claimants to manufacture convincing observable manifestations of [mental illness] or, worse yet, discourage them from exercising the right to appear before an [ALJ] for fear that they may not appear to the unexpert eye to be as bad as they feel.

*Id.* (quoting *Tyler v. Weinberger*, 409 F. Supp. 776, 789 (E.D. Va. 1976)).

AO 72A
(Rev.8/8
2)

jurisprudence that is not tolerated.[14]  As a result, the Commissioner's decision must be

remanded.  Although this conclusion provides a sufficient basis to remand the case, the

undersigned will evaluate the ALJ's treatment of the medical opinions because there

are other problems with the ALJ's analysis of these opinions.

The ALJ's decision to provide more weight to the 2005 opinion by Stone-Miller

is not supported by substantial evidence.  First, it does not appear that the ALJ used the

factors for weighing medical opinions outlined in 20 C.F.R. §§ 404.1527(d)(1)-(6),

416.927(1)-(6) in choosing to give the 2005 report more weight than the 2008 report.

The sole basis for giving more weight appears to be the proximity of the report to the

amended onset date of disability.  [*See* R21].  The proximity to the onset date is not one

of the factors listed in the regulations for weighing medical opinions, and the Court has

found no case law that has found proximity to the onset date as a persuasive factor in

weighing medical opinions where both opinions were made after the onset date.[15]

_____

[14]      The undersigned recognizes that the ALJ qualified his observations from the hearing by stating that "the hearing is short-lived and cannot be deemed a conclusive indicator of the claimant's overall intellectual ability or psychological fitness on a day-to-day basis." [R20].  The ALJ's decision belies this statement because the ALJ has not and cannot point to any medical record evidence to support his conclusions.

[15]      The Court has found case law indicating that a medical opinion prior to the onset date will be given less weight.  *See, e.g,* *Heppell-Libsansky v. Comm'r of Soc.*

AO 72A
(Rev.8/8
2)

Also, this focus on proximity to the onset date ignores the record evidence of the similarities between the 2008 report and the 2005 report.  Both reports diagnosed Plaintiff with PTSD, generalized anxiety, panic disorder with agoraphobia, and major depressive disorder, moderate.  [R272, 611[16]].  Also, the 2005 report suggested that Plaintiff might have difficulty with understanding, remembering, and carrying out simple instructions, sustaining concentration, relating to others, adhering to a typical workday or workweek, and maintaining an acceptable work pace.  [R273].  The 2008 report confirmed these impressions because Stone-Miller found that Plaintiff would have difficulty understanding and remembering simple instructions, maintaining concentration, relating to others, adhering to a workday or workweek, and maintaining an acceptable pace at work.  [R611].  The only significant difference between the two reports is the question about malingering and the absence of test results from the 2005 report, but the omission of malingering from the 2008 report does not undermine it.

---

*Sec.*, 170 Fed. Appx. 693, 698 (11th Cir. 2006) (noting it appropriate to give less weight to treating physician where he only saw plaintiff twice after onset date); *Payne v. Comm'r of Soc. Sec. Admin.*, No. 97-cv-4578, 1998 WL 808616, *5 (E.D. Pa. Nov. 23, 1998) (noting that opinion might properly be disregarded where it was made two years prior to the onset date).  This case law does not support, however, a conclusion that proximity to the onset date entitles an opinion to greater weight.

[16]     The 2008 report added a mild mental retardation diagnosis and indicated, however, that Plaintiff's depressive disorder was in partial remission.  [R611].

40

To the extent that the ALJ found malingering based on the 2005 report, the report does not support this finding and instead constitutes a misreading of the 2005 report. Stone-Miller found that the following factors "raise[d] the issue of malingering": Plaintiff's report of no benefits from medication, her endorsement of almost every symptom of mental illness, her inability to provide basic information about education or work history, her extreme emotional state, her refusal to complete standardized tests, her lack of recent mental health treatment records, and her lack of corroboration from other sources. [R273]. This was not a finding, however, of malingering because Stone-Miller determined that despite the problems with motivation and task persistence during the evaluation, the "general consistency across the available sources of information indicat[ed] an adequate level of validity for th[e] evaluation." [R272]. As a result, the ALJ could not give greater weight to the 2005 report based on a conclusion that Plaintiff was malingering because there was no finding on this issue.

Additionally, the medical evidence following the 2005 report does not demonstrate that Plaintiff was malingering. This evidence indicates that Plaintiff was prescribed and taking anxiety and depression medications, [*see* R271, 291, 297, 331, 421, 545, 603], engaged in mental health therapy since 2005, [*see* R329, 347-61, 623-39], and was diagnosed by medical and other sources with similar mental impairments

and found to have similar limitations, [*see* R327, 598-99, 601-03].[17]  Based on these factors, the Court concludes that the ALJ erred in evaluating the opinions of Dr. Stone-Miller.

Besides these problems with evaluating Stone-Miller's opinions, the undersigned concludes that the ALJ erred in evaluating the opinions from the county mental health professionals.  These opinions fall into two categories - - acceptable medical opinions (Dr. Smith) and non-acceptable medical source opinions (Nurse Evans and Social Worker Saidi).  The ALJ did not give these opinions weight because he believed that they were hyperbolized, not consistent with the evidentiary record, contradicted Plaintiff's appearance at the hearing, and contradicted the indicia of competence in

---

[17]     As an additional note, the Court observes that the ALJ gave selective and inconsistent weight to the 2005 report to support the RFC finding.  In the decision, the ALJ stated that "[a]t the hearing, the claimant's attorney cited Exhibit[] 5F . . . in support of a more restrictive [RFC] that would preclude the performance of substantial gainful activity," but the ALJ found that Exhibit 5F was "not considered fully credible in contrast to the claimant's appearance and testimony during the hearing." [R21]. A review of the record demonstrates that Exhibit 5F is Stone-Miller's 2005 report. [*See* R269-73].  Thus, the ALJ's decision has both given weight to the 2005 report and given little weight to the same report.  The Court does not understand this inconsistent reliance on the same report, and the ALJ has not explained the inconsistency.  This further undermines the ALJ's decision.  *See McKoy v. Astrue*, No. 4:08-cv-2329, 2009 WL 2782457, *11 (D.S.C. Aug. 28, 2009) (requiring the ALJ to provide an explanation for how ALJ considered and resolved inconsistent use of medical opinion); *Zappia v. Astrue*, No. 08-cv-3107, 2009 WL 424561, *6 (C.D. Ill. Feb. 19, 2009).

AO 72A
(Rev.8/8
2)

maintaining a home, a toddler, and sending her son to college. [R21].  The undersigned agrees with the ALJ that the evidence did not support the conclusion by Evans and Dr. Smith that Plaintiff had disabling psychological limitations since 1995, [R605], given Plaintiff's work history between 1995 and 2005, [*see* R80].  However, this is the only instance in which the Court agrees with the ALJ because substantial evidence does not support his other findings.

First, the ALJ's reliance on the demeanor of Plaintiff at the hearing was improper sit and squirm analysis as discussed above.  Second, the evidentiary record supports the conclusions of these other sources, contrary to the ALJ's statement.  These source opinions made diagnoses of depression and found Plaintiff had anxiety, [*see* R327, 329, 405, 421, 598], and prescribed medications for these conditions, [R367, 392, 394, 421, 603].  These findings were consistent with the other evidence in the record, including the 2005 report from Stone-Miller to which the ALJ gave some weight.  [*See* R272].[18]

_____

[18]     The only inconsistent evidence are the two state agency non-consulting opinions from the October 2005 and January 2006.  [*See* R274-86, 298-308].  Although the ALJ was required to consider these opinions, *see* 20 C.F.R. § 404.1527(f), there is no indication in his decision that he did, contrary to the Commissioner's argument to the Court.  [*See* Doc. 13 at 11-12].  If the ALJ had considered these opinions, he would have had to also explain the weight given to the opinions in his decision.  *See* 20 C.F.R. § 404.1527(f)(2)(ii).  The ALJ's decision is silent as to these opinions.  As such, the Court finds the Commissioner's argument to be impermissible post hoc reasoning, or, alternatively, if the ALJ did rely on these opinions, he erred by failing to properly apply

AO 72A
(Rev.8/8
2)

These sources also found similar limitations as Stone-Miller.  [*Compare* R273, 613-14 *with* R408-10, 601-03].

Third, the ALJ's findings of Plaintiff's "indicia of competence" do not serve a basis for discrediting the other opinions.  Although the hearing testimony revealed that Plaintiff's son would be enrolling in college, the hearing evidence did not show that the son was in college or that Plaintiff had any role in sending her son to college.  The Court is not clear how the following testimony reveals that Plaintiff was sending her son to college:

Q     Does your older son still go to school?

A     Actually he's about to go to Ashford University.

Q     Okay.  Is that in this area?  I don't know.

A     Dunwoody, I think it's Dunwoody.

[R701].  First, it does not demonstrate that Plaintiff's son was actually in college, which the ALJ recognized at the hearing (though not in the decision) when he commented that "You said [your son's] going to, to Ashford in the fall." [R702].  Second, the testimony

the regulations.  Also, these two opinions were made before Plaintiff's treatment at the Clayton and Henry County centers and Stone-Miller's 2008 report and contradict the findings of every other source that examined Plaintiff.  These non-examining reports are therefore do not constitute substantial evidence in support of the ALJ.

44

does not provide any insight into Plaintiff's role in her son going to college. Therefore, there is no evidence supporting the ALJ's conclusion that Plaintiff "testified that her son is now a student at Ashford University" and that she was "sending [him] to college." [R21].

As for the other two "indicia of competence" - - caring for an infant and delegating duties - - these indicia are not evidence that contradicts the opinions of the other sources. Again, the ALJ was to consider the following factors in weighing the opinion evidence:

> • How long the source has known and how frequently the source has seen the individual;
>
> • How consistent the opinion is with other evidence;
>
> • The degree to which the source presents relevant evidence to support an opinion;
>
> • How well the source explains the opinion;
>
> • Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
>
> • Any other factors that tend to support or refute the opinion.

SSR 06-03p, 2006 WL 2329939 at *4-5; *see also* 20 C.F.R. §§ 404.1527(d), 416.927(d). The ALJ's indicia of competence do not make this list. Federal courts

have indicated, however, that a claimant's daily living activities, including maintaining a home and caring for a child, may constitute the sort of "other evidence" that can be used to give less weight to a medical opinion.[19]  The Court concludes, however, that the indicia of competence cited by the ALJ in this case do not provide a substantial basis for rejecting the medical source opinions all of which are consistent in their findings. There is no record evidence showing that child rearing and child instruction are transferrable skills to the workplace or that they undermine the limitations and opinions found by the medical sources.  Also, Plaintiff testified that her son assisted with these duties, [R702], a statement on which the ALJ did not make a credibility finding. Further, the ALJ never described how the medical opinions or limitations were contradicted by the "indicia of competence," so the Court cannot determine why child

_____

[19]     See *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (affirming decision to reject statements by treating physician because, *inter alia*, "the restrictions appear[ed] to be inconsistent with the level of activity that [claimant] engaged in by maintaining a household and raising two young children, with no significant assistance"); *Schneeberg v. Astrue*, 669 F. Supp. 2d 946, 956 (W.D. Wis. 2009) (appearing to criticize the ALJ for "not identifying what it was about plaintiff's ability to care for her children and perform household tasks that he perceived to be inconsistent with [treating doctor's] limitations," but being satisfied that the ALJ applied the regulation properly based on treatment notes and other medical evidence to support the ALJ's conclusions); *Carvey v. Astrue*, No. 6-cv-737, 2009 WL 3199215, *7 (N.D.N.Y. Sept. 30, 2009) (declining to give controlling weight to doctor's opinions where plaintiff's testimony of activities contradicted evidence).

rearing permitted the ALJ to give less weight to the 2008 Stone-Miller report or to Dr. Smith's opinion.[20]  Finally, there are no medical opinions in the record to support the ALJ's findings, so the indicia of competence by themselves do not constitute substantial evidence without some elaboration by the ALJ about how these indicia undermine the medical opinions.   *Cf. Evans v. Astrue*, No. 5:08-cv-181, 2009 WL 3189180, *4-6 (M.D. Ga. Sept. 30, 2009) (concluding that substantial evidence supported ALJ's RFC finding where ALJ found: (1) plaintiff's testimony about depression and anxiety attacks was not credible because plaintiff cared for two small children as a single mother, was able to drive, and was able to do grocery shopping; (2) the medical opinions and treatment records supported the RFC; and (3) other evidence supported the RFC).

Accordingly, the Court concludes that the ALJ erred in evaluating the medical opinions in this case.  As a result, the Court **REMANDS** the case to the Commissioner.

---

[20]    For instance, Plaintiff testified that she got her youngest child ready for school. [R701].  This testimony of child rearing may have entitled the ALJ to reject the various opinions about Plaintiff's inability to keep a schedule.  [*See* R273, 408, 601, 611].  The ALJ does not explain his reliance on Plaintiff's child rearing in this manner when rejecting other opinions, [*see* R21], and the Court will not make such a finding for the ALJ.

AO 72A
(Rev.8/8
2)

B.      *Past Relevant Work and Social Security Ruling 82-62*

Plaintiff contends that the ALJ erred by finding that Plaintiff had past relevant work experience as a small products assembler because there is no evidence that the job was either substantial or gainful. [Doc. 11 at 18-19].  Additionally, Plaintiff argues that even if the assembler job constituted past work, the ALJ did not comply with Social Security Ruling 82-62 because he did not compare Plaintiff's RFC with the physical and mental demands of the assembler position.  [*Id.* at 18].

The Commissioner contends that Plaintiff did not meet her burden of showing that the assembler position was not past relevant work.  [Doc. 13 at 21-22].  The Commissioner also argues that evidence shows that Plaintiff could perform the assembler position.  [*Id.* at 22-23].  The Commissioner alternatively argues that even if the assembler job were not past relevant work or that Plaintiff could not perform it, the error would be harmless because the ALJ made an alternate finding that Plaintiff could perform other work.  [*Id.* at 23-24].

Plaintiff replies that she has met her burden of showing that her past work did not include an assembler position because the earnings record does not show that the job is substantial or gainful.  [Doc. 14 at 5].  Plaintiff also argues that the VE considered short term jobs as past relevant work because he listed Plaintiff's daycare attendant job

48

AO 72A
(Rev.8/8
2)

as past work despite Plaintiff's testimony that it was a summer job.  [*Id.* at 5-6].

Plaintiff finally argues that the ALJ improperly compared his RFC with the physical

and mental demands of Plaintiff's past work.  [*Id.* at 7].

A claimant has the burden of showing that certain work experience is not past

relevant work.  *Barnes*, 932 F.2d at 1359.  Past relevant work is "work that [a claimant

has] done within the past 15 years, that was substantial gainful activity, and that lasted

long enough for [claimant] to learn to do it."   20 C.F.R. §§ 404.1560(b)(1),

416.960(b)(1).  Thus, past relevant work exists when three conditions are met: (1) the

work was recent, *i.e.*, it occurred within 15 years; (2) the work was of sufficient

duration, *i.e.*, the claimant had enough time to learn the skills needed for average

performance in the job; and (3) the work constituted substantial gainful activity.

SSR 82-62; *see also* 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1).  Work is substantial

if the work activity "involves doing significant physical or mental activities."

20 C.F.R. §§ 404.1572(a), 416.972(a).  Work is gainful if it is done for pay or profit.

*Id.* §§ 404.1572(b), 416.972(b).  Generally, the following monthly earnings will not

result in a finding of substantial gainful activity: (1) earnings less than or equal to $500

per month between January 1990 and June 1999; (2) earnings less than or equal to $700

per month between July 1999 and December 2000; (3) earnings less than or equal to

AO 72A
(Rev.8/8
2)

$740 per month in 2001; (4) earnings less than or equal to $780 per month in 2002; (5) earnings less than or equal to $800 per month in 2003; (6) earnings less than or equal to $810 per month in 2004; and (7) earnings less than or equal to $830 in 2005. *See* 20 C.F.R. §§ 404.1574(b)(2)(i), (ii).[21]

"Any case requiring consideration of [past relevant work] will contain enough information on past work to permit a decision as to the individual's ability to return to such past work (or to do other work)." SSR 82-62. A claimant's statements about her past relevant work "are generally sufficient for determining the skill level, exertional demands and nonexertional demands of such work." Adequate documentation of past work is to be obtained from the claimant, employer or other source and includes: (1) factual information about work demands that affect a claimant's medically established limitations; (2) detailed information about the past work requirements, including strength, endurance, manipulative, and mental demands; and (3) information about job titles, dates of previously performed work, compensation rate, the knowledge

---

[21]   The figures for 2001 to 2005 were calculated using the formula in 20 C.F.R. § 404.1574(b)(2)(ii)(B), *i.e.*, "multiplying $700 by the ratio of the national average wage index for the year 2 calendar years before the year for which the amount is being calculated to the national average wage index for 1998." The Social Security Administration lists the yearly national average wage index online at http://www.ssa.gov/OACT/COLA/AWI.html (last visited 5/27/2010).

AO 72A
(Rev.8/8
2)

required, the extent of supervision, and the description of tasks and tools used. *See* SSR 82-62.

Since the case must be remanded based on the ALJ's improper evaluation of the medical opinions in this case, the Court also **REMANDS** the case for the Commissioner to reevaluate whether Plaintiff's job as a parts assembler constitutes past relevant work. Plaintiff's earning statement shows that she met the monthly earnings criteria under 20 C.F.R. § 404.1574(b)(2) for the years 1998 and 2002-2205. [*See* R80]. The evidence shows that Plaintiff's primary work was through temp agencies. [*See* R82-87, 697-98]. Plaintiff indicated that some of the temp jobs were longer term, [R698], which led to the following exchange at the evidentiary hearing:

Q    Okay. And as far as the temporary jobs were any of them focused in any, any specific area or was it just whatever they happen they need people at that point - -

A    It was, some of it was just focusing one certain area.

Q    Okay. And what were those, to the extent you recall what were those?

A    I worked at this safe company where they specialize in safes, you know, that you see in Wal-Mart and stuff.

. . .

51

> A       Where you have to put the locks and stuff on them and clean them
>           and send them through.

[R699].   The VE then testified that Plaintiff's past relevant work included parts

assembler.   [R713].   Thus, there is some evidence that this parts assembler position

might constitute past relevant work.   However, there is no evidence when this work

occurred, so it is not possible to determine whether the work meets the earnings

requirements for past work under § 404.1574(b).   Although Plaintiff may be to blame

for the lack of evidence on this issue,[22] the Court concludes that given the need to

remand the case for the Commissioner to re-evaluate the medical opinions, the

Commissioner should also re-examine on remand Plaintiff's past relevant work,

including the determination that her past work included a job as a parts assembler.

---

[22]       *See Barnes*, 932 F.2d at 1359 ("[Plaintiff] offered no evidence at the
hearing to rebut the [ ] reasonable determination that she was able to perform her past
relevant work . . . .").

AO 72A
(Rev.8/8
2)

C.    *Residual Functional Capacity*[23]

Plaintiff argues that the ALJ erred in formulating the RFC for Plaintiff. [Doc. 11 at 19-22]. First, Plaintiff contends that the ALJ did not explain his finding that she could perform light work through a narrative discussion as to how the evidence supports this conclusion. [*Id.* at 19]. Second, Plaintiff asserts that evidence does not support a finding that Plaintiff could perform light work. [*Id.* at 20-21]. Third, Plaintiff contends that the ALJ erred by evaluating her mental limitations. [*Id.* at 21-22].

The Commissioner first responds that the ALJ's RFC determination was supported by the substantial evidence. [Doc. 13 at 13-15]. The Commissioner next argues that the physical RFC considered Plaintiff's subjective complaints and ACL tear diagnosis. [*Id.* at 15-17]. The Commissioner finally argues that the mental RFC was supported by substantial evidence. [*Id.* at 17-20].

Plaintiff replies that her testimony about walking and sitting is not consistent with a finding that she could do light work. [Doc. 14 at 7-8]. Plaintiff also notes that Dr. Rao's opinion does not support a finding of light work. [*Id.* at 8]. Plaintiff also

---

[23]    If a plaintiff does not meet or equal a Listing, the ALJ determines the plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC "is the most [a claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ is responsible for assessing the RFC. 20 C.F.R. §§ 404.1546(c), 416.946(c).

AO 72A (Rev.8/82)

contends that the Commissioner ignored her diagnoses of panic disorder with agoraphobia and PTSD and that limiting interactions with the public did not resolve the issue of interactions with coworkers. [*Id.* at 9-10]. Finally, Plaintiff asserts that limitations caused by difficulties dealing with stress should be evaluated when there are exertional limitations as well as nonexertional ones. [*Id.* at 10].

The Court concludes that the Commissioner should reconsider Plaintiff's RFC on remand. In making the RFC determination, the ALJ examines all of the relevant medical and other evidence. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); *see also* Social Security Ruling ("SSR") 96-8p. Thus, the ALJ must consider medical opinions in evaluating the RFC and will consider any statements about what the claimant can still do and descriptions and observations about the claimant's impairments. *See* 20 C.F.R. §§ 404.1527(b), 416.927(b), 404.1545(a)(3, 416.945(a)(3). Since the ALJ erred in evaluating the medical opinions in this case, it follows that the ALJ made his RFC determination without properly considering the medical opinions. As a result, the Court also **REMANDS** the case for the Commissioner to re-evaluate Plaintiff's RFC.

AO 72A
(Rev.8/8
2)

## VIII.  CONCLUSION

For the aforementioned reasons, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** the case for further proceedings consistent with this opinion.  The Clerk is **DIRECTED** to enter final judgment in Plaintiff's favor.

**IT IS SO ORDERED and DIRECTED,** this the 27th day of May, 2010.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

55